Joel L. Herz, Esq. -    State Bar Number 015105
Law Offices of Joel L. Herz
3573 East Sunrise Drive, Suite 215
Tucson, AZ 85718
(520) 529-8080
Attorney for Plaintiff Joan Matthey

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Joan Matthey, a single woman, | **NO.** |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| Wells Fargo & Company, Plan Sponsor, a Delaware corporation; Liberty Life Assurance Company of Boston, a New Hampshire corporation; John Does 1-10; Jane Does 1-10; ABC Companies 1-10; XYZ Corporations 1-10, | |
| Defendants. | |

## COMPLAINT

Joan Matthey ("Plaintiff" or "Ms. Matthey"), by and through her undersigned attorney, Joel L. Herz of the Law Offices of Joel L. Herz, for her causes of action against Wells Fargo & Company, Liberty Life Assurance Company of Boston, John Does 1-10, Jane Does 1-10, ABC Companies 1-10 and XYZ Corporations 1-10 (hereinafter collectively "Defendants"), allege, upon knowledge as to herself, and upon information and belief as to all other matters, as follows:

## STATEMENT OF CASE AND JURISDICTION

Plaintiff, Joan Matthey, an individual residing in Pima County, Arizona, brings this action against Wells Fargo & Company, a Delaware corporation, Liberty Life Assurance Company of Boston, a New Hampshire corporation, John Does 1-10, Jane Does 1-10, ABC Companies 1-10 and XYZ Corporations 1-10, individuals, companies or corporations who employed, insured, or

1

provided benefits to Plaintiff, the identities of which are not yet known to Plaintiff, under: (1) the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1104 (Breach of fiduciary duty); §§ 1132 (Civil enforcement); §§ 1140 (Interference with protected rights) including but not limited to 29 U.S.C. §1132(1)(B) to recover benefits due, to enforce rights under the ERISA Plans, and to clarify rights for future benefits.

1.      Jurisdiction over the federal claims are invoked, inter alia, pursuant to 29 U.S.C. 1132(e)(1) (the statute dealing with jurisdiction under ERISA), 28 U.S.C. § 1331 (the statute providing for federal question jurisdiction) and pendant jurisdiction. Jurisdiction is also appropriate pursuant to 28 U.S.C. §1332 (diversity jurisdiction) in that the Plaintiffs and all defendants reside in different states and the amount in controversy exceeds $75,000.  Jurisdiction over the claims is appropriate because Plaintiff resides in Tucson, Pima County, Arizona, and Defendants employed or insured or provided benefits to Plaintiff while she was a resident of Pima County, Arizona.

**VENUE**

2.      This action properly lies in the District of Arizona, inter alia, pursuant to 28 U.S.C. § 1391(b), because the claim arose in this judicial district.

**JOAN MATTHEY AND HER DISABILITY**

4.      Ms. Matthey is 53 years old.  Until she became too disabled to work, Ms. Matthey was employed by Wells Fargo Bank ("Wells Fargo") as a personal banker.  Ms. Matthey began her employment with Wells Fargo in 1985 as a teller and has been repeatedly promoted.  When Ms. Matthey went on disability, Wells Fargo paid her no less than $37,264.00 per year, plus bonuses.  As part of her compensation, Ms. Matthey was provided both short term and long-term disability benefits.  In addition, Ms. Matthey paid for optional long term disability coverage.  Long term disability should commence when an employee, like Ms. Matthey is unable to return to

**COMPLAINT**

work for six months.  In Ms. Matthey's case, she has had her total colon and rectum removed causing her, *inter alia*, "severe unrelenting diarrhea over 20 times per day," inability to retain new information due to several surgeries lasting 8-10 hours in length, no bowel  movements – only fluid, and burning which leads her to tears.

5. As set forth below, Ms. Matthey's physicians have repeatedly certified that she is totally disabled and unable to work.

**FREDERICK A. KLEIN, M.D.**

6. On July 11, 2013, Frederick A. Klein, M.D., a board-certified physician specializing in gastroenterology and internal medicine, and Ms. Matthey's gastroenterologist, confirmed to Wells Fargo's long-term disability provider, Liberty Mutual, that Ms. Matthey is totally disabled as follows:

> I am writing concerning my patient Ms. Joan Matthey.  Ms. Matthey has undergone a total proctocolectomy with ileal pouch for severe ulcerative colitis. In spite of treatment with anticholinergics, as well as other medications, she continues to have severe unrelenting diarrhea over 20 times per day.
>
> Given the extent of her problem with known ileal pouch and the severity of her diarrhea, **I feel that this patient does require a full disability as it is extremely difficult for her to carry on work of any sort.**

*See* letter from Frederick A. Klein, M.D. dated July 11, 2013, attached hereto as Exhibit A, at Matthey00310[1].

**MELISSA RAY, M.D.**

7. On July 15, 2013, Melissa Ray, M.D., a board-certified physician specializing in Family Medicine, and Ms. Matthey's treating physician, stated as follows:

---

[1] Liberty Mutual's claim file and policy have been bates-stamped Matthey001-Matthey00546. All references hereto to bates-stamped documents are documents already in Liberty Mutual's possession and contained within its claim file.

3

**COMPLAINT**

Had 5 surgeries at Mayo in 2011, had hemorrhaging, needed multiple blood transfusions.  Had colostomy bag for 1 year.  Had takedown.  States is in restroom 15-20 times a day, up 5 times a night.  Went back to work 2/2012 after surgery in 11/2011.  Ended up needing surgery 3 more times after that.  States employer wasn't very accommodating.  Will have increased BMs with any stress.  Has also been working on diet modification.  Also, with "burning in my back end" which will sometimes be so bad "it leads me to tears" and surgeon recommended exercise.  Needs to take 3 showers a day to comfort rectum.  States that no BM per rectum, will have fluid per rectum.

Surgeon then said to followup with local doctors.  Has seen Dr. Klein for this, who said to get OTC paste.  Was approved by SS disability, for 9 months, then if gets sick to stay on it.  Has had hernia surgery since then.  Has also had problems with memory since her surgeries, has had multiple long surgeries (8-10 hours).  Tried to take class and wasn't able to retain any new information.

Has had 2 naps where woke up and took a while to know where she was.  I scheduled to see Dr. Sullivan to evaluate this.

...

**Given that her pouch is still maturing, and that she has such frequent BMs, as well as the unpredictable nature of this, agree that she is not able to work at this time.  Discussed with Nancy Favata, PA who has been Ms. Matthey's caregiver in this office and will write a letter stating this.**

*See* Dr. Ray's July 15, 2013 note, attached hereto as Exhibit B (emphasis added).

## NANCY FAVATA, P/A-C

8.      On July 23, 2013, Nancy Favata, P/A-C, a board-certified physician assistant, and Ms. Matthey's treating physician's assistant, also confirmed that Ms. Matthey is totally disabled as follows:

This 53-year-old Caucasion female has a history of ulcerative colitis resolved status post five surgeries at the Mayo Clinic in 2011.  She has colostomy bag for one year and had a takedown.  Since this time she is in the restroom 15-20 times a day up to 5 times a night.  She tried to go back to work on February 2012 after her surgery in November 2011.  She required 3 more surgeries after that.  She does see Dr. Klein for management of her diarrhea and he feels she is totally disabled and is writing a letter to this effect.  **She is also having memory issues since her surgeries as she had multiple long surgeries 8-10 hours in length.  She tried to take a class but was not able to retain any new information which obviously effects her job.**

**Given that her pouch is still maturing and that she has frequent unpredictable BM's and memory issues I feel she is unable to work at this time and is totally disabled.**

4

*See* Nancy Favata, P/A-C's July 23, 2013 letter, attached hereto as Exhibit C (Matthey00230)

(emphasis added).

## SARAH SULLIVAN, D.O.

9.     On August 5, 2013, Sarah Sullivan, D.O., a neurologist, examined Ms. Matthey

due to her recent memory loss issues.  As set forth in her consultation report:

> She [Ms. Matthey] states that she was attempting to take a computer test but failed the test because she had difficulty focusing and concentrating.  She subsequently dropped out of a course because of frustration regarding her memory.
> . . .
>
> Joan Matthey is a 53-year old female seen in neurologic consultation at your request with regard to history of memory change with an extensive surgical history.  Frontal infarct is certainly possible given the above symptoms.  In addition, I cannot exclude complex partial seizure.

Seizure was ruled out via an EEG on August 8, 2013.  *See* Northwest NeuroSpecialists, PLLC

August 5, 2013 consultation report and Northwest Medical Center Electroencephalogram report,

dated August 8, 2013, attached hereto as Exhibit D.

## SCOTT BELANGER, Psy.D.

10.    On August 15, 2013, a neuropsychological evaluation was performed by Scott

Belanger, Psy.D., an Arizona licensed psychologist.  Per his conclusion:

> **Ms. Matthey's pattern of neurocognitive performance meets criteria for multi-domain Mild Cognitive Impairment (MCI).  She demonstrates mild impairment in visuoperceptual processing, visual memory, and aspects of executive functioning that likely represent a decline from a previously higher level of functioning.**  In terms of localization, the pattern reveals weakness in areas of cognition mediated by the frontal lobes and greater involvement of the right cerebral hemisphere.  This takes the form of deficits in executive functioning, along with weaker visuoperceptual processing and visual memory when compared to verbal counterparts.

*See* Neuropsychological Evaluation dated August 15, 2013, attached hereto as Exhibit E

(emphasis added).

5

**COMPLAINT**

**JACQUES HEPPELL, M.D.**

11.     Jacques Heppell, M.D. is an Arizona board certified physician specializing in colon and rectal surgery.  He is the physician who certified on July 24, 2012 that Ms. Matthey was unable to perform her job duties "with or without reasonable accommodation."  *See* Health Provider Recommendation for Accommodation, attached hereto as Exhibit F (Matthey0032-0034).  He also performed the pouchoscopy in August 2012.

12.     Per the Wells Fargo Description of Employee's Job Duties, the activity requirement of Ms. Matthey's job duties as Personal Banker 1 requires her, in each 8-hour day, to "frequently" sit, stand and walk for 3-6 hours.  Her job activity level was specifically checked as "frequent," not "never, seldom, or occasionally."   The job duties also require face-to-face customer contact, overtime and meeting quotas.  The job description also states that "ongoing employment is contingent upon meeting all such requirements."   As set forth in the job description, a personal banker "sells retail banking products and services to customers and prospects.   Manages customer portfolio, services relationships and cross-sells products and services.  Provides broad base of financial and credit services with the goals of acquiring 100% of the customers' business."  *See* Wells Fargo Description of Employee's Job Duties, attached hereto as Exhibit G (Matthey004-005).

13.     Ms. Matthey cannot meet the Wells Fargo job requirements as she cannot sit with customers for 3-6 hours per day as required to sell the products in order to meet her "productivity goals" due to having no colon, no rectum, severe diarrhea 20 times per day, no energy, and mild cognitive impairment to the point where she cannot retain new information.

14.     Ms. Matthey cannot meet the Wells Fargo job requirements as the job causes stress and any stress increases the frequency of her bowel movements, as stated by Dr. Ray in her July 15, 2013 report, as follows:  "will have increased BMs with any stress."  In addition, where there

6

is only one restroom at the bank branch, Ms. Matthey has to leave the branch and go to a neighboring business to use the restroom.

15.     Ms. Matthey cannot meet the Wells Fargo job requirements, as she is currently taking no less than eight medications and supplements in an attempt to relieve her symptoms, as follows: Vitamin C, Vitamin D 50,000 IU D2, Potassium 20 meq, Vitamin B12, Loprimade, Chlorthalidone 50mg, Fluoxetine 20mg, Lorazapam as needed, Amitriptyline as needed, and she sometimes uses a cpap mask.

16.     On July 5, 2010, the Social Security Administration found that Ms. Matthey was disabled.   *See* Social Security Administration Notice of Award, attached hereto as Exhibit H.

17.     On August 12, 2012, Liberty Mutual determined that Ms. Matthey was totally disabled and placed her on short-term disability for 26 weeks (25 weeks after the 7-day waiting period), from August 12, 2012 to February 9, 2013.

18.     Instead of relying on Ms. Matthey's physicians' expertise who repeatedly stated that Ms. Matthey is disabled, examining Ms. Matthey in person, or hiring a vocational expert, Liberty Mutual sent Ms. Matthey's medical records to its own in-house doctor, Ronald Green, M.D. in London, Kentucky, for a peer review.  *See* Exhibit I, Matthey00237-242.

19.     Instead of relying on Ms. Matthey's physicians' expertise who repeatedly stated that Ms. Matthey is disabled, examining Ms. Matthey in person, or hiring a vocational expert, Liberty Mutual hired a company to follow Ms. Matthey and perform surveillance over 27 hours on February 5, 6, and 7, 2013 and paid that company $1,995.00.  As set forth in the surveillance report, all that was reported was less than 48 minutes of Ms. Matthey "walking in a free and unrestricted manner", bending, standing, and exiting and entering her vehicle.  It is not contested that Ms. Matthey can walk, bend, and stand.  What was not reported was how many times Ms. Matthey had to use the restroom throughout the day because of her severe diarrhea, how much

she had to rest, and how her memory problems affected her.  Based on the surveillance report, it appears that the longest Ms. Matthey was away from a restroom was 20 minutes.  Ms. Matthey's job requires her to sit for 3-6 hours with no breaks.  This surveillance report does not prove that she can do so.   *See* Exhibit J, Kolb, Stewart & Associates, Inc. February 11, 2013 report (Matthey00215-00224) and invoice (Matthey00227).

20.     Instead of relying on Ms. Matthey's physicians' expertise who repeatedly stated that Ms. Matthey is disabled, examining Ms. Matthey in person, or hiring a vocational expert, Liberty Mutual hired another doctor, Thomas Liebermann, M.D., with MLS Group of Companies, to review Ms. Matthey's medical records and review the surveillance.  *See* Dr. Liebermann's report dated February 27, 2013, attached hereto as Exhibit K (Matthey00250-00254).  Liberty Mutual paid Dr. Liebermann $881.25 (Exhibit K, Matthey00225).

21.     Although Dr. Liebermann's report is dated February 27, 2013, he did not send a letter to Nancy Favata, PA/C, requesting that she confirm what he quoted from their conversation in his report was correct, until March 4, 2013.  *See* Exhibit K, Matthey00255.

22.     On March 6, 2013, Liberty Mutual denied Ms. Matthey's application for long-term disability benefits, stating that "based on the review of the medical information and activity observation, you are able to perform the duties of your Own Occupation.  Therefore, you do not meet your policy's definition of disability, and we must deny your claim for benefits."  *See* Exhibit L, letter from Liberty Mutual dated March 6, 2013 (Matthey00412-00415).

23.     In Liberty Mutual's denial letter, Mr. Costa states that the medical documentation was reviewed by a Physician, Board Certified in Gastroenterology, which indicated as follows:

. . .

Current impairment is related to diarrhea with profound frequency and fatigue.  Nocturnal diarrhea and reported sleep apnea probably contribute to fatigue.  The cause of diarrhea is under investigation but workup has been postponed until

8

**COMPLAINT**

February 4, 201[4] because of the recent surgery in December. **There is adequate support for less than sedentary capacity pending her gastroenterology consultation and follow up after the scheduled EGD and pouchoscopy February 4, 2013, unless there is improvement in her clinical status prior to that date.**

*See* Exhibit L, Matthey00413.

24.     This is the review that was performed by Ronald S. Green, M.D, the doctor employed by Liberty Mutual.  In his report, Dr. Green thought the diarrhea could have been caused by the drug "Setraline"; however, as reported by Thomas Liebermann, a gastroenterologist hired by Liberty Mutual:  "Sertraline given for the treatment of depression was thought to possibly enhance the claimant's problem with diarrhea. The claimant discontinued the medication but approximately one month later it did not appear that her diarrhea had changed substantially and therefore it is not possible to conclude with certainty that Sertraline had anything to do with her diarrhea." *See* Exhibit K, Matthey00253.

25.     Liberty Mutual's denial also quotes the review by Thomas Liebermann, M.D., who himself reiterated that Ms. Matthey needs "to be close to a restroom as she experiences twenty-five bowel movements per day and night" as follows:

> The claimant has a history of severe diarrhea. This problem creates logistical issues for her especially if she leaves the house as she has to be aware of where the restrooms are located. The diarrhea in itself has not been incapacitating since it does not cause dehydration or electrolyte abnormalities. The diarrhea appears not to have had a serious negative effect on her nutrition either. The claimant is not impaired beyond her need **to be close to a restroom as she experiences twenty-five bowel movements per day and night.** Following her hernia surgeries she was advised against lifting objects weighing more than twenty pounds. That limitation has been lifted as of the middle of January, 2013.

*See* Exhibit K at Matthey00253; Exhibit L at Matthey00414.

26.     Liberty Mutual's denial letter includes Dr. Liebermann's peer-to-peer discussion with Nancy Favata, PA, who stated it was her opinion that "the claimant was not in a position to return to work in the foreseeable future." *See* Exhibit L, Matthey00414.

9

27.     Liberty Mutual based its denial solely on a surveillance of Ms. Matthey and Dr. Liebermann's review of that surveillance, who concluded as follows:  "It is difficult to conceive that an individual that is experiencing significant epigastric pain and especially up to twenty-five bowel movements per day and night would be capable of providing what appear to be normal shuttle services for her children, seemingly without difficulty and without the need for using restrooms along the way."  *See* Exhibit L, Matthey00414.  But it cannot be possible that Dr. Liebermann even viewed that video because it never shows Ms. Matthey, ever being away from a bathroom, for more than 20 minutes.   Again, the surveillance person either shut his videotape off after less than 20 minutes and did not record the portions showing her going to the bathroom, or the surveillance personnel destroyed the tape favorable to Ms. Matthey.

28.     On April 5, 2013, Ms. Matthey appealed Liberty Mutual's decision.  As set forth in her letter, Ms. Matthey has had eight surgeries since 2011, is in the bathroom 20 to 25 times a day, her rectum burns 80% of the time, and she takes 2 to 3 showers a day to keep the burning down.  The individuals who performed surveillance do not know what pain she suffered or how often she used the restrooms before she left the house and when she returned.  *See* Ms. Matthey's April 5, 2013 Appeal (without attachments) attached hereto as Exhibit M (Matthey00176-00177).

29.     Instead of relying on Ms. Matthey's board certified physicians' opinions, personally examining Ms. Matthey, or hiring a vocational expert, on May 10, 2013, Liberty Mutual had yet another independent peer review performed.  This review was performed by a New York, physician, Steven C. Tawil, M.D.  (Exhibit N, Matthey 00261-00267)  As was done by Dr. Liebermann, Dr. Tawil writes his report, quoting conversations he had with Ms. Matthey's physicians (Drs. Klein and Ray), but intentionally does not send letters to the physicians requesting they confirm what he reported was correct, or provide corrections as to any misstatements, until after the report was drafted, May 10, 2013.  Dr. Tawil provided a deadline of May 24, 2013 for the doctors to respond to his request.  *See* Exhibit N at Matthey00266-00267

**COMPLAINT**

(letters to Drs. Klein and Ray dated May 10, 2013).  Liberty Mutual paid Dr. Tawil $926.25 (Exhibit N, Matthey00226).

30.    Dr. Tawil also lists in his report that he reviewed the surveillance report of Kolb, Stewart & Associates dated February 11, 2013.  If Dr. Tawil would have reviewed the surveillance report, he would have found that all that was reported was less than 48 minutes of Ms. Matthey "walking in a free and unrestricted manner," bending, standing, and exiting and entering her vehicle.  He would have also found that the longest Ms. Matthey was away from a restroom was 20 minutes.

31.    If Dr. Tawil would have reviewed the surveillance report, he would have come to the conclusion that Ms. Matthey could not sit for 3-6 hours with no breaks, as required by her own occupation.

32.    If Dr. Tawil would have spoken with Ms. Matthey, he would have found that she did not refuse to try the Amitriptyline, as he stated in his report ("She saw the gastroenterologist who recommended Amitriptyline but did not try it") (Exhibit N, at Matthey00263), but she had actually ordered the medication and is taking it.  Dr. Tawil would have also found that Ms. Matthey was actually de-hydrated, not hydrated as stated in his report.

33.    Liberty Mutual intentionally did not allow Ms. Matthey's doctors to respond to the inconsistencies they found in Dr. Tawil's report, and on the same date their responses were due, May 24, 2013, blatantly denied Ms. Matthey's appeal, based upon the unconfirmed conversations that Dr. Tawil had with Ms. Matthey's physicians, Drs. Klein and Ray.  *See* Liberty Mutual's May 24, 2013 denial letter attached hereto as Exhibit O (Matthey00416-00424).

34.    Liberty Mutual's peer review physicians have never seen, interviewed, or examined Ms. Matthey.

**COMPLAINT**

35.    No vocational specialist has determined if in fact Ms. Matthey is physically capable of performing her own occupation.

36.    As a result of the many inconsistencies Ms. Matthey found in Dr. Tawil's report, and the subsequent denial by Liberty Mutual of Ms. Matthey's appeal, Ms. Matthey experienced many sleepless nights.

37.    On January 27, 1989, the Eighth Circuit Court of Appeals, in *Mackinaw v. Otis R. Bowen, M.D., Secretary of Health and Human Services*, 866 F.2d 1023 (1989), held that the Secretary of Health and Human Services must "produce a vocational expert to establish that Mackinaw is not disabled."  Edward Mackinaw was an individual suffering from the same disease as Ms. Matthey ("ulcerative colitis since 1969, underwent a total colectomy at that time and had an ileostomy placed. The ileostomy bag, which Mackinaw must empty several times a day, collects diarrhea and blood. His rectum is closed, but it bleeds when he is under physical strain").

38.    The Veterans Administration has also determined that an individual with no colon constitutes a 100% disability.

39.    Pursuant to the terms of Wells Fargo's Group Disability Income Policy (the "Policy"), Liberty Mutual agreed to pay to Ms. Matthey monthly disability benefits upon the occurrence of a disability, as that term is defined in the Long Term Disability Plan, until Ms. Matthey reached the age of 67 years old.

40.    Pursuant to the terms of the Policy, to qualify for long term disability benefits, an employee must:

- Be covered by the LTD Plan on the initial date of your disability.
- Be disabled as defined by the LTD Plan for more than 26 weeks.
- Continue to pay premiums for Optional LTD coverage during the LTD waiting period and until your claim for LTD benefits is approved.
-  Receive approval for LTD benefits by Liberty.
- Receive appropriate care and treatment by a doctor on a continuous basis.
- Provide proof that you are disabled under the terms of the LTD Plan.

**COMPLAINT**

*See* Exhibit P, Matthey00502-521**.**

41.    As set forth in the Policy, "Disability" or "Disabled" means:

    i.    that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and

    ii.    thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

*See* Exhibit P, Matthey00507.

42.    As set forth in the Policy, "Material and Substantial Duties" means:

**Material and substantial duties**

"Material and substantial duties" means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified.

*See* Exhibit P, Matthey00510.

43.    As set forth in the Policy, "Own Occupation" means:

**Own occupation**

"Own occupation" means the Covered Person's occupation that he was performing when his Disability or Partial Disability began.  For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the local economy.

*See* Exhibit P, Matthey00511.

44.    As confirmed by Ms. Matthey's board-certified physicians, Ms. Matthey is unable to perform the material and substantial duties of her own occupation for any employer in her local economy.

45.    The ERISA Plan Administrator has a duty to act in a fiduciary capacity for Mrs. Clark in getting her the disability income she is due.

**COMPLAINT**

## MS. MATTHEY'S MEDICAL HISTORY

46.     Ms. Matthey has had a long history of ulcerative colitis.

47.     Due to severe rectal bleeding and anemia, Ms. Matthey's medical condition was interfering with her work and she went off of work in July 2010.

48.     On July 5, 2010, the Social Security Administration found that Ms. Matthey was totally disabled.

49.     In January 2011, Ms. Matthey underwent a total colectomy and temporary loop ileostomy. This was complicated by a wound infection and a sinus tract, which required incision and drainage.

**5**0.     In July 2011, Ms. Matthey underwent a proctectomy and IPAA with associated closure of the ileostomy in November, 2011.

51.     In November 2011, Ms. Matthey had a total colostomy takedown.

52.     Ms. Matthey had several complications and additional surgeries afterwards, but was able to return to work in January 2012.

53.     Ms. Matthey's continued to experience abdominal pain and diarrhea, but she continued working.

54.     On August 1, 2012, Ms. Matthey went to the Urology Department at Mayo Clinic for a follow-up regarding lower irritative voiding symptoms.  The recommendation was to have a cystoscopy performed.

55.     On August 2, 2012, due to Ms. Matthey's complaints of bladder spasm, persistent problem with higher frequency of bowel movements and pain in the right lower quadrant of her abdomen, Ms. Matthey had a pouchoscopy performed at Mayo Clinic by Dr. Heppell.  There was no evidence of pouchitis, but the increased frequency of bowel movements was of unknown etiology.

**COMPLAINT**

56.     On August 3, 2012, Ms. Matthey had surgery for cystoscopy, right ureteroscopy and kidney stone extraction.

57.     On August 11, 2012, it was determined that Ms. Matthey was unable to work and she was placed on short term disability beginning August 12, 2012.

58.     On September 5, 2012, James Madura, MD of the Mayo Clinic performed an incisional hernia surgery.

59.     On October 18, 2012, in a post-surgery visit, Dr. Madura examined Ms. Matthey, as she had firmness in the area after her September 5, 2012 hernia surgery and she notices that the firm area has gotten larger.  She was complaining of gastrointestinal symptoms related to diarrhea and fecal incontinence.  He determined that Ms. Matthey had a recurrent incisional hernia.

60.     On October 18, 2012, Ms. Matthey was also seen by Dr. Heppell (colorectal surgery) with complaints of "having up to 20 bowel movements a day including four or five at night."  He performed a pouchoscopy and his impression was:  "Macerated anoderm associated with persistent diarrhea, status post ileal-pouch-anal anastomosis, in a very pleasant 52-year-old lady with history of obesity, depression, kidney stones, recurrent abdominal wall hernia, ulcerative colitis, hypertension, history of total abdominal hysterectomy."  It was Dr. Heppell's plan to "obtain a MR enterography to rule out any inflammatory lesions in the small bowel that could lead to persistent diarrhea and I will ask Dr. Heigh (gastroenterologist) to see Ms. Matthey again for opinion and management."

61.     On November 12, 2012, Ms. Matthey appeared at the Mayo Clinic for "2 month history of epigastric pain described as intermittent epigastric pain with occasional nausea. . . reports long-term history of frequent diarrhea up to 20 stools in a 24 hour period.  This has been followed by Dr. Heppell who has performed pouchoscopy. . ."  It was Dr. Heppell's diagnosis that Ms. Matthey had "1.  New onset of epigastric pain, possibility of gastritis, peptic ulcer

15

disease, small bowel bacterial overgrowth; 2.  Chronic diarrhea after 20 stools a day, possibly related to infectious etiology verus pouchitis, v. SIBO; 3.  Recent MR enterography within normal limits with surgical changes of total colectomy and ileal pouch and ilecanal anastomosis; 4.  Recent evaluation by Dr. Madura with subsequent repair of incisional hernia tentatively scheduled December 7, 2012.

62.    On November 15, 2012, Ms. Matthey presented at her primary physician's office (Nancy Favata, PA/C – Melissa Ray, M.D.) with active problems of:  sleep apnea, depression, diarrhea, hypertension, mycroscopic hematuria, pain during urination, pelvic pain, ulcerative colitis and vitamin d deficiency.  She complained of several months of rectal bleeding every time she has a bowel movement and epigastric pain.  She was ordered to discontinue Triamterene, and prescribed Chlorthalildone and Potassium Chloride.

63.    On December 10, 2012, Ms. Matthey had abdominal ventral hernia surgery at the Mayo Clinic.  She was ordered to continue to take the current eight medications she was on and to add two additional medications.

64.    On December 18, 2012, Ms. Matthey called the Mayo Clinic reporting a lot of "cramping abdominal pain, diarrhea and about 10 stools more than usual."  She was told to follow up with her primary care physician.

65.    On December 27, 2012, Ms. Matthey had a follow-up visit with James Madura, MD at the Mayo Clinic for her hernia repair surgery.  Dr. Madura noted that Ms. Matthey had discomfort for several days after surgery which has resolved and she "is only experiencing her preoperative symptoms consistent with her bowel issues prior.  This is diarrhea after eating and occasional crampy left-sided pain."

66.    On January 8, 2013, Jacques Heppell, M.D. contacted Ms. Matthey after having been contacted by Dr. Ronald Green, the doctor hired by Liberty Mutual to review Ms. Matthey's

16

claim.   As per Dr. Heppell's note, "Dr. Green noted that Mrs. Matthey is taking setraline. Apparently this antidepressant can potentially be causing lymphocytic or collagenous enterocolitis."

67.    On January 11, 2013, Ms. Matthey followed up with Nancy Favata, PA with regard to her chronic diarrhea (at least 20 episodes per day).    Ms. Favata noted that Ms. Matthey's gastroenterologist (and her surgeon – which was not her surgeon, but Liberty Mutual's reviewing physician) think the diarrhea might be from the setraline but as Ms. Favata states, "she's been on this for many years.  Consequently, she discontinued her setraline several weeks ago and now has increased anxiety and depression. **She still has diarrhea at least 20 episodes a day and does have a follow up at the Mayo Clinic.**  She would like to try a different antidepressant. "  Ms. Favata also noted that "[s]he also has had a cough for several months."

68.    Ms. Matthey returned to see Nancy Favata, PA/C and Dr. Ray on January 31, 2013 complaining of "two week history of intermittent dizziness that occurs episodically usually with a change position."  "She is s/p total colectomy for Ulcerative colitis and still has diarrhea at least 20 episodes a day with abdominal pain and is being evaluated at Mayo.  However, she cannot work due to the diarrhea and request disability paperwork completed."  She was diagnosed with probable vertigo as well as the longstanding diarrhea.

69.    On March 18, 2013, Ms. Matthey went to Arizona Gastroenterology with complaints of daily diarrhea (15 stools a day), "[t]he problem is worse.  Symptom is aggravated by stress.  Associated symptoms include flatulance, cramping.  As per the comments:

> This is a 53 year old female who presents with c/o increased stools daily with some associated irritation.  She was going to MAYO clinic in Scottsdale for follow-up of her UC [ulcerative colitis].  She had colostomy takedown in 12/2011.  And was doing well, but states that recently she has been having more frequent stools-feels that some of it may be stress induced. **She gets nervous and embarrassed at work, constantly excusing herself to use the bathroom.  She has brought paperwork to get a medical leave in order to try and get her**

**symptoms more under control so that she may return and be a more functional employee."**

70.     As set forth above, Ms. Matthey is not a malingerer, as she was attempting to get her symptoms under control so that she may return to work.

71.     On March 19, 2013, Ms. Matthey was seen by Nancy Favata, PA/C for complaints of hand swelling.   Ms. Favata changed her blood pressure medication from chlorthalidone to amitriptyline.

72.     On June 17, 2013, Ms. Matthey was seen by Nancy Favata, PA/C as Ms. Matthey had fallen and landed on her tailbone.  She was still complaining of persistent diarrhea some days up to 20 stools a day.

73.     On July 1, 2013, Ms. Matthey returned to Dr. Klein, her gastroenterologist.

74.     On July 11, 2013, Dr. Klein wrote to Liberty Mutual certifying that Ms. Matthey does "require a full disability as it is extremely difficult for her to carry on work of any sort."

75.     On July 15, 2013, Melissa Ray, M.D., Ms. Matthey's treating physician certified that Ms. Matthey is totally disabled, as follows:

> **Given that her pouch is still maturing, and that she has such frequent BMs, as well as the unpredictable nature of this, agree that she is not able to work at this time.  Discussed with Nancy Favata, PA who has been Ms. Matthey's caregiver in this office and will write a letter stating this.**

76.     On July 23, 2013, Nancy Favata, P/A-C, a board-certified physician assistant, and Ms. Matthey's treating physician's assistant, also confirmed that Ms. Matthey is totally disabled as follows:

> **Given that her pouch is still maturing and that she has frequent unpredictable BM's and memory issues I feel she is unable to work at this time and is totally disabled.**

77.     On August 5, 2013, Sarah Sullivan, D.O., a neurologist, examined Ms. Matthey due to her recent memory loss issues.

18

**COMPLAINT**

78.    On August 15, 2013, a neuropsychological evaluation was performed by Scott Belanger, Psy.D., an Arizona licensed psychologist.  Per his conclusion:

**Ms. Matthey's pattern of neurocognitive performance meets criteria for multi-domain Mild Cognitive Impairment (MCI).  She demonstrates mild impairment in visuoperceptual processing, visual memory, and aspects of executive functioning that likely represent a decline from a previously higher level of functioning.**  In terms of localization, the pattern reveals weakness in areas of cognition mediated by the frontal lobes and greater involvement of the right cerebral hemisphere.  This takes the form of deficits in executive functioning, along with weaker visuoperceptual processing and visual memory when compared to verbal counterparts.

79.    Ms. Matthey is currently taking no less than eight medications and supplements, as follows: Vitamin C, Vitamin D 50,000 IU D2, Potassium 20 meq, Vitamin B12, Loprimade, Chlorthalidone 50mg, Fluoxetine 20mg, Lorazapam as needed, Amitriptyline as needed, and she sometimes uses a cpap mask.

### BENEFITS DUE TO MS. MATTHEY

80.    As an employee of Wells Fargo & Company, Ms. Matthey was entitled to participate in and benefit from, the various benefit plans and programs made available to employees of Wells Fargo.

81.    As an employee of Wells Fargo, Ms. Matthey Clark was entitled to participate in and benefit from, the Wells Fargo & Company Long-Term Disability Plan and such other Plans which have not been properly named or identified (collectively, the "Plans").  The Plans provide Ms. Matthey with a variety of health, retirement, insurance, and other benefits including but not limited to long term disability insurance.

82.    As an employee of Wells Fargo, Ms. Matthey fell into a class that provided a benefit equal to 65% of her monthly base salary, as Ms. Matthey had optional long term disability coverage which provided an additional 15% over the usual 50%.

**COMPLAINT**

83.    Ms. Matthey's medical condition has not changed since August 12, 2012, when it was determined she was disabled from performing her own occupation.

**PROBLEMS IN THE PROCESS OF HANDLING MS. MATTHEY'S CLAIM**

84.    Despite the undisputed medical history, Liberty Mutual has denied Ms. Matthey's benefits.

85.    Liberty Mutual based this claim upon peer physician medical records reviews, telephone conversations with some of her physicians, and surveillance.

86.    Liberty Mutual hired peer review physicians who intentionally quoted conversations with Ms. Matthey's physicians without allowing the physicians to confirm what was stated in these conversations was correct.

87.    These physicians never saw, interviewed, or examined Ms. Matthey.

88.    No vocational expert has determined if in fact Ms. Matthey is physically capable of performing her own occupation.

89.    Liberty Mutual, in its denial of benefits, is not aware of the stress caused by Ms. Matthey's position and that this stress contributes to her medical problems.

**PROBLEMS IN GENERAL OF LIBERTY MUTUAL'S PROCESS FOR HANDLING DISABILITYCLAIMS**

90.    Under ERISA, ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) defines "fiduciary" as "a person is a fiduciary with respect to a plan to the extent (i) he . . . exercises any authority or control respecting management or disposition of its assets . . . "

91.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), "Fiduciary duties", reads in pertinent part:

COMPLAINT

(a) Prudent man standard of care

    1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and;
(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
    . . . .
(D) in accordance with the documents and instruments governing the plan  insofar as such documents and instruments are consistent with the provisions of  this subchapter or subchapter III of this chapter.

92.    The Plan Administrator cannot allow Defendant to act out of self interest in deciding what to deny.  Clearly, it is in the interest of Defendant to deny claims because this saves the company money.  But to comply with ERISA law, the Plan Administrator must act in a fiduciary capacity for Ms. Matthey's interest.  In this case, her interest is in getting the disability income she is due.  This is obviously very important to Ms. Matthey.  Without this income, she is in constant danger of financial ruin.  Ms. Matthey is raising her two daughters on her own, and has all the ordinary bills people have, including a mortgage.  It was precisely to protect her financial health that Ms. Matthey sought the protection of a disability policy.

93.    If the Plan Administrator gives Ms. Matthey's interests proper consideration, it would approve her claim.  No good excuse exists for the Plan not to approve this claim.  All of Ms. Matthey's doctors concur that she is disabled.  Liberty Mutual had no evidence to the contrary, other than the opinion of its in-house doctor, Dr. Green, and out-of-state peer review physicians hired by Liberty Mutual – both of which based their opinions on surveillance where

the camera was either shut off after less than 20 minutes, or the surveillance personnel destroyed the tape favorable to Ms. Matthey.

## **FIRST CAUSE OF ACTION**

### **(Violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1101 et seq. - All Defendants)**

94.     Plaintiff realleges the above paragraphs as if fully set forth herein.

95.      Defendants had an obligation to Ms. Matthey to provide benefits to Ms. Matthey under the terms of the ERISA Plan, including but not limited to disability benefits.

96.     Defendants have failed and refused to provide benefits to Ms. Matthey under the terms of the Plans, including but not limited to disability benefits.

97.     Ms. Matthey is entitled to recover benefits due to her under the terms of the Plan, to enforce her rights under the terms of the Plan, and to clarify her rights to future benefits under the terms of the Plan.

98.     Defendants should be enjoined from denying benefits owed to Ms. Matthey under the Plan, including but not limited to, the refusal and denial to provide disability benefits and to make payment to Ms. Matthey for all such benefits, plus reasonable prejudgment interest on such amounts.

99.     ERISA provides that all Plan Administrators have "fiduciary duties" such that they must discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries.

100.     Wells Fargo & Company, as the Plan Administrator of the Plan, did not discharge "fiduciary duties" in that they did not act solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries.

COMPLAINT

101.    Wells Fargo & Company, as the Plan Administrator of the Plan, has breached its "fiduciary duties" to Ms. Matthey.   To the extent that any functions were assigned to Liberty Mutual, Liberty Mutual breached its duties also.

102.    Plaintiff has exhausted the required administrative remedies.

103.    Pursuant to Section 113 (g) of ERISA, Ms. Matthey is entitled to reasonable attorney's fee and costs of action.

104.    Ms. Matthey is also entitled to a waiver of premiums per the terms of the policy for "any period for which benefits are payable."

### PRAYER FOR JUDGMENT AND REQUESTED DAMAGES

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them:

A.    For an amount which will make the Plaintiff whole, including but not limited to, retroactive benefits from the date that Defendants first stopped paying disability benefits and other benefits under the Plans, including but not limited to, waiver of premiums, retirement benefits and life insurance that would have – and should accrue – but for the wrongful denial of long term disability benefits by Defendants plus pre and post judgment interest in an amount to be proven at trial.

B.    For attorneys' fees and costs in obtaining Judgment against Defendants.

C.    For such further relief as the court deems just under the circumstances.


Dated: September 17, 2013                     /s/ Joel L. Herz                          
       Tucson, Arizona                        Joel L. Herz
                                              LAW OFFICES OF JOEL L. HERZ
                                              La Paloma Corporate Center
                                              3573 East Sunrise Drive, Suite 215
                                              Tucson, Arizona  85718

COMPLAINT